# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

CHAZ PINKSTON,

*Plaintiff-Appellee*,

*v.*

DOCTOR HENDRICK KUIPER, MEDICAL DIRECTOR,

*Defendant-Appellant*.

On Appeal from the United States District Court
for the Northern District of Mississippi, No. 4:17-cv-39

## BRIEF FOR PLAINTIFF-APPELLEE

OREN NIMNI
SAMUEL WEISS
RIGHTS BEHIND BARS
416 Florida Avenue NW, #26152
Washington, DC 20001
(202) 455-4399

MARK C. FLEMING
SOFIE C. BROOKS
WILMER CUTLER PICKERING
　HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000
mark.fleming@wilmerhale.com

ANDRES C. SALINAS
WILMER CUTLER PICKERING
　HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 663-6000

January 26, 2022

# CERTIFICATE OF INTERESTED PERSONS

Case No. 21-60320

*Pinkston v. Kuiper*

The following listed persons and entities as described in the fourth sentence of Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

1. Chaz Pinkston, plaintiff-appellee;

2. Dr. Hendrick Kuiper, defendant-appellant;

3. Mississippi Department of Corrections, former defendant;

4. Nurse Leatha Barron, former defendant;

5. Centurion of Mississippi, LLC, former defendant;

6. Captain Robert Benford, former defendant;

7. Lieutenant Keba Taylor, former defendant;

8. Sergeant Steven Anderson, former defendant;

9. Pelicia Hall, former defendant;

10. Michael Bentley, Molly Walker, Erin Saltaformaggio, Michael Williams, Stephen Fritz, and the law firm of Bradley Arant Boult Cummings LLP, counsel for defendant-appellant;

11. Samuel Weiss, Oren Nimni, and the organization Rights Behind Bars, co-counsel for plaintiff-appellee;

12. Mark C. Fleming, Andres C. Salinas, and Sofie C. Brooks, and the law firm Wilmer Cutler Pickering Hale and Dorr LLP, co-counsel for plaintiff-appellee;

13. The Honorable Debra M. Brown, United States District Judge; and

14. The Honorable David Sanders, United States Magistrate Judge.


/s/ Mark C. Fleming
MARK C. FLEMING

*Attorney of record for Plaintiff-Appellee Chaz Pinkston*

**STATEMENT REGARDING ORAL ARGUMENT**

Appellee Chaz Pinkston respectfully requests oral argument for this matter. Oral argument is warranted here because it would assist the Court in resolving the legal questions presented by this appeal.

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTERESTED PERSONS ............................................................. i

STATEMENT REGARDING ORAL ARGUMENT ............................................. iii

TABLE OF AUTHORITIES ................................................................. vi

ISSUES PRESENTED FOR REVIEW ................................................................. 1

INTRODUCTION ................................................................. 2

STATEMENT OF THE CASE ................................................................. 4

    A.    Factual Background ................................................................. 4

    B.    Procedural History ................................................................. 7

        1.    Summary Judgment Proceedings ................................................................. 7

        2.    First Evidentiary Hearing And The Magistrate Judge's Report and Recommendation ................................................................. 9

        3.    Rejection Of The Report And Recommendation ................................................................. 10

        4.    Second Evidentiary Hearing And Final Judgment ................................................................. 12

SUMMARY OF ARGUMENT ................................................................. 15

STANDARD OF REVIEW ................................................................. 16

ARGUMENT ................................................................. 18

I.    MR. PINKSTON HAS A SIGNIFICANT LIBERTY INTEREST IN AVOIDING INVOLUNTARY ADMINISTRATION OF ANTIPSYCHOTIC DRUGS ................................................................. 18

    A.    *Harper*'s Due Process Framework Governs This Case ................................................................. 18

    B.    Dr. Kuiper's Proposed "Professional Judgment" Standard Contravenes *Harper* And Would Essentially Eliminate The Constitution's Protection Against Forcible Medication ................................................................. 24

II.   DR. KUIPER VIOLATED MR. PINKSTON'S SUBSTANTIVE AND
      PROCEDURAL DUE PROCESS RIGHTS ............................................28

      A.   Mr. Pinkston Had A Substantive Right To Refuse
           Antipsychotic Medication Because He Was Not A
           Danger To Himself Or Others .........................................29

           1.   The District Court's Factual Findings Were Not
                Clearly Erroneous, And Its Legal Conclusion Was
                Correct ..........................................................29

           2.   The District Court Did Not Improperly Shift The
                Burden To Dr. Kuiper ......................................35

      B.   Dr. Kuiper Violated Mr. Pinkston's Procedural Due
           Process Rights By Failing To Provide Any Pre-
           Deprivation Process ......................................................37

III.  DR. KUIPER'S REMAINING CHALLENGES ARE UNAVAILING ...........41

      A.   The District Court Did Not Abuse Its Discretion In
           Excluding Dr. Kuiper's Expert Testimony, And Any
           Error Was Harmless In Any Event ..................................42

      B.   The District Court Correctly Held That Mr. Pinkston Had
           Not Clearly Waived His Right To Be Present At The
           Evidentiary Hearing ......................................................46

CONCLUSION .......................................................................49

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Adkins v. Kaspar*,
393 F.3d 559 (5th Cir. 2004) ........................................................................16

*Anderson v. City of Bessemer City*,
470 U.S. 564 (1985)......................................................................................17

*Ashford v. United States*,
511 F.3d 501 (5th Cir. 2007) ........................................................................16

*Bagley v. Smith*,
132 F.3d 1455, 1997 WL 802857 (5th Cir. 1997)........................................23

*Barto v. Shore Construction, LLC*,
801 F.3d 465 (5th Cir. 2015) ........................................................................16

*Binh Hoa Le v. Exeter Finance. Corp.*,
990 F.3d 410 (5th Cir. 2021) ........................................................................46

*Bowlby v. City of Aberdeen*,
681 F.3d 215 (5th Cir. 2012) ........................................................................41

*Brandt v. Monte*,
626 F. Supp. 2d 469 (D.N.J. 2009)...............................................................33

*Davoll v. Webb*,
194 F.3d 1116 (10th Cir. 1999) ....................................................................44

*Deutsch v. Annis Enterprises, Inc.*,
882 F.3d 169 (5th Cir. 2018) ........................................................................11

*DeVoss v. Southwest Airlines Co.*,
903 F.3d 487 (5th Cir. 2018) ........................................................................47

*Doe v. Dyett*,
1993 WL 378867 (S.D.N.Y. Sept 24, 1993) ................................................34

*Farabee v. Yaratha*,
801 F. App'x 97 (4th Cir. 2020)....................................................................26

*FCC v. Beach Communications, Inc.*,
    508 U.S. 307 (1993)..................................................................37

*Flowers v. Phelps*,
    956 F.2d 488 (5th Cir. 1992) ...............................................16

*Freeman v. Texas Department of Criminal Justice*,
    369 F.3d 854 (5th Cir. 2004) ...............................................37

*Fuller v. Dillon*,
    236 F.3d 876 (7th Cir. 2001) ...............................................34

*Guertin v. State*,
    912 F.3d 907 (6th Cir. 2019) ...............................................18

*Guzman v. Hacienda Records & Recording Studio, Inc.*,
    808 F.3d 1031 (5th Cir. 2015) ...............................17, 32, 47

*Hogan v. Carter*,
    85 F.3d 1113 (4th Cir. 1996) ...........................................24, 25

*Houston Aquarium, Inc. v. Occupational Safety & Health Review
    Commission*,
    965 F.3d 433 (5th Cir. 2020) ...............................................46

*Jenkins v. United States*,
    857 F. App'x 820 (5th Cir. 2021) ..........................................24

*Johnson v. Meltzer*,
    134 F.3d 1393 (9th Cir. 1998) ...............................................18

*Johnson v. Zerbst*,
    304 U.S. 458 (1938)..................................................................48

*Kulas v. Valdez*,
    159 F.3d 453 (9th Cir. 1998) ..................14, 23, 33, 36, 38

*Lane v. Tennessee*,
    315 F.3d 680 (6th Cir. 2003) ...............................................47

*Latiolais v. Whitley*,
    93 F.3d 205 (5th Cir. 1996) ...............................................47

*Mathews v. Eldridge*,
424 U.S. 319 (1976)......................................................20, 23, 38, 39

*McAfee v. Martin*,
63 F.3d 436 (5th Cir. 1995) ..........................................................16

*North Cypress Medical Center Operating Co. v. Aetna Life Insurance Co.*,
898 F.3d 461 (5th Cir. 2018) ........................................................17

*Perry v. Sims*,
990 F.3d 505 (7th Cir. 2021) ..................................................13, 34

*Peterson v. Wilson*,
141 F.3d 573 (5th Cir. 1998) ........................................................25

*Riggins v. Nevada*,
504 U.S. 127 (1992)................................................................21, 36

*Roe v. Operation Rescue*,
920 F.2d 213 (3d Cir. 1990) .........................................................48

*St. Joseph Abbey v. Castille*,
712 F.3d 215 (5th Cir. 2013) ........................................................36

*Stevens v. St. Tammany Parish Government*,
17 F.4th 563 (5th Cir. 2021) ........................................................25

*Stine v. Marathon Oil Co.*,
976 F.2d 254 (5th Cir. 1992) ........................................................31

*Sullivan v. Flanigan*,
8 F.3d 591 (7th Cir. 1993) ...........................................................36

*Turner v. Safley*,
482 U.S. 78 (1987).......................................................................36

*United States ex rel. Vavra v. Kellogg Brown & Root, Inc.*,
848 F.3d 366 (5th Cir. 2017) ........................................................31

*United States v. Cooks*,
589 F.3d 173 (5th Cir. 2009) ........................................................43

*United States v. Gutierrez*,
    443 F. App'x 898 (5th Cir. 2011) .................................................................33

*United States v. Mann*,
    532 F. App'x 481 (5th Cir. 2013) ................................................................33

*United States v. Masha*,
    990 F.3d 436 (5th Cir. 2021) .......................................................................43

*United States v. Riddle*,
    103 F.3d 423 (5th Cir. 1997) .......................................................................43

*United States v. Underwood*,
    597 F.3d 661 (5th Cir. 2010) .......................................................................48

*United States v. Yanez Sosa*,
    513 F.3d 194 (5th Cir. 2008) .......................................................................44

*Washington v. Harper*,
    494 U.S. 210 (1990) ............................................................................*passim*

*Williams v. Mast Biosurgery USA, Inc.*,
    644 F.3d 1312 (11th Cir. 2011) ...................................................................44

*Youngberg v. Romeo,*
    457 U.S. 307 (1982) .....................................................................................26

*Zinermon v. Burch*,
    494 U.S. 113 (1990) ..............................................................................23, 41

## STATUTES, RULES, AND REGULATIONS

28 U.S.C. § 636 ............................................................................................48

42 U.S.C. § 1983 .............................................................................................7

Fed. R. Evid. 701 ....................................................................................42, 43

## ISSUES PRESENTED FOR REVIEW

1.      Whether the district court correctly held that that Dr. Hendrick Kuiper violated Chaz Pinkston's substantive due process rights by forcibly administering Haldol and Benadryl to Mr. Pinkston without his consent.

2.      Whether the district court correctly held that Dr. Kuiper violated Mr. Pinkston's procedural due process rights by forcibly administering Haldol and Benadryl to Mr. Pinkston without his consent.

**INTRODUCTION**

Following a four-day evidentiary hearing, the district court made detailed factual findings and concluded that Dr. Hendrick Kuiper violated Chaz Pinkston's substantive and procedural due process rights by spontaneously ordering that Mr. Pinkston be forcibly medicated with Benadryl and Haldol, an antipsychotic drug. As the court explained, Mr. Pinkston's substantive rights were infringed because there was no factual basis to support a finding that he posed a threat of harm to himself, others, or property at the time of the injections. The injections therefore violated the rule established in *Washington v. Harper*, 494 U.S. 210, 221-222 (1990), which held that prisoners have "a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs."

Further, Mr. Pinkston's procedural due process rights were separately violated because the district court found that Dr. Kuiper failed to provide Mr. Pinkston *any* procedural protections prior to ordering the injections, and that there was insufficient evidence to conclude that emergency circumstances made it impossible to provide such minimal protections. The absence of any pre-deprivation process, again, violated the holding of *Harper*.

Instead of meaningfully disputing the court's factual findings or legal conclusions, Dr. Kuiper primarily argues that the district court applied the wrong legal standard. He argues that both the substantive and procedural due process

inquiries should rise and fall on Mr. Pinkston's ability to show an absence of "professional judgment." As Dr. Kuiper articulates that standard, prisoners may be spontaneously and forcibly medicated with antipsychotic drugs even when they are not dangerous to anyone—and without any required pre-deprivation procedural protections. Moreover, to ultimately prevail in litigation, incarcerated plaintiffs would be forced to somehow retain their own medical experts and prove that the defendant's "medical judgment" was wrong.

That is not the law. Dr. Kuiper's invocation of professional judgment appears to originate—at least in name—from cases involving due process claims for ***denial*** of care. Such claims involve allegations that the government violated the Constitution by ***failing to act***, which is fundamentally different from a claim like Mr. Pinkston's, which rests on a government actor's ***affirmative intrusion*** into the plaintiff's bodily integrity. That distinction is key. Forcible medication claims are subject to a different standard, as *Harper* clearly establishes. It should come as no surprise, then, that Dr. Kuiper's proposed standard finds virtually no support in case law involving forcible medication, and certainly not in case law from this Circuit. The case on which Dr. Kuiper principally relies, in fact, involved a qualified immunity defense, which Dr. Kuiper has not asserted.

Dr. Kuiper's remaining arguments are unavailing. He provides no basis for overturning the district court's factual findings as clearly erroneous, and his

argument that the district court misapplied the relevant legal standard is wrong as a matter of law. His sole evidentiary challenge suffers the same fate: The district court was correct to exclude Dr. Kuiper's testimony about purported background psychiatry principles because he was not qualified as an expert and, indeed, is not even a psychiatrist. In any event, any error on that issue would have been harmless because the purported testimony had no bearing on the dispositive issue. Irrespective of whether administering the drugs was in Mr. Pinkston's medical interest, *Harper* still required proof that Mr. Pinkston was a danger to himself or others before he was forcibly drugged.

As the district court explained, the undisputed facts here demonstrate only that Mr. Pinkston was "being loud and disruptive," which did not pose a danger to himself or others. ROA.3008. Because that does not satisfy the *Harper* standard, and because Mr. Pinkston was provided no pre-deprivation procedural protections, the district court was correct to hold that his substantive and procedural due process rights were violated. The judgment should be affirmed.

## STATEMENT OF THE CASE

### A.    Factual Background

On the morning of September 14, 2016, Chaz Pinkston awoke in his cell at the Mississippi State Penitentiary (MSP) to find six painful boils in his inner thigh and groin area. ROA.3001. At the time, Mr. Pinkston was assigned to MSP's

psychiatric ward due to an alleged hunger strike at another facility.  ROA.3001.

Mr. Pinkston's only diagnosis on September 14, however, was Narcissistic

Personality Disorder, which required monitoring but did not require any

medication.  ROA.2995; ROA.3001.  Indeed, Mr. Pinkston had never required

antipsychotic drugs for any diagnosed condition during his incarceration.

ROA.3001.  Nor did he have any history of violence:  Although his "medical

records indicated that he had previously made threats, verbally harassed staff, and

used profanity," he had never assaulted anyone or caused any property damage

while incarcerated.  ROA.2988; ROA.3001.  Mr. Pinkston's history of hunger

strikes, in fact, was designed to "bring attention to issues, both personal and

institutional," that he "believed needed to be addressed."  ROA.3001.

Upon discovering the boils on his skin on September 14, Mr. Pinkston

immediately requested medical attention, but was ignored by MSP staff.

ROA.3001.  As a result, Mr. Pinkston became upset and began to yell and beat on

his cell door in an attempt to have his medical needs addressed.  ROA.3001.  He

also made some verbal threats toward MSP nurses.  ROA.2987, ROA.2999,

ROA.3006.  Neighboring inmates began to yell and bang on their cell doors as

well.  ROA.3001.  All inmates remained confined in their cells, though—including

Mr. Pinkston.  ROA.3001.

Hearing the disruption from his office downstairs, Dr. Hendrick Kuiper came up to the cell block to assess the situation. ROA.3001-3002. With a specialty in surgery, Dr. Kuiper was the Medical Director at MSP and oversaw the "health of all MSP patients," but he left "[d]aily medical care … to the treating psychiatrist and nurses." ROA.2987, ROA.2994. After arriving outside of Mr. Pinkston's cell, Dr. Kuiper asked him "more than once to settle down." ROA.3002. Mr. Pinkston and the other inmates continued to be disruptive. ROA.3002.

Dr. Kuiper then ordered that Mr. Pinkston be given injections of Benadryl and Haldol, an antipsychotic drug. ROA.3002. The Mississippi Department of Corrections (MDC) has a written policy generally requiring at least twenty-four hours' notice and a hearing prior to the involuntary administration of antipsychotic medication. ROA.2459-2464. Dr. Kuiper undisputedly did not provide such procedures or obtain Mr. Pinkston's consent before ordering that he be drugged. ROA.3002. Nor did Dr. Kuiper consult with Mr. Pinkston's treating psychiatrist. ROA.3002. Instead, two guards and one nurse immediately entered Mr. Pinkston's cell, where he remained confined throughout the relevant period, and injected Mr. Pinkston with Haldol and Benadryl. ROA.2988, ROA.3002. According to Dr. Kuiper, "[h]is order allowed Haldol to be given again after six hours but that became unnecessary because the first dose had its desired effect—to calm

Pinkston." ROA.2997. None of the other inmates who participated in the disruption was administered any medication. ROA.3002.

## B.    Procedural History

Proceeding pro se, Mr. Pinkston filed a complaint under 42 U.S.C. § 1983 in the district court against MDC, Centurion of Mississippi, LLC (a contractor at MSP), and several prison officials, including Dr. Kuiper. ROA.32-40. As amended, the complaint alleged Eighth Amendment deliberate indifference claims based on MSP's failure to treat the skin condition on Mr. Pinkston's legs, and that defendants violated Mr. Pinkston's due process rights by forcibly medicating him. ROA.32-40, ROA.154-166.

### 1.    Summary Judgment Proceedings

On December 5, 2017, defendants moved for summary judgment, arguing, among other things, that (1) Mr. Pinkston could not establish vicarious liability; (2) his deliberate-indifference claim failed for insufficient evidence; and (3) his forcible-medication claim failed because he presented a danger to himself and others at the time the medication was administered. ROA.238, ROA.297, ROA.285-295. Although defendants pled qualified immunity as a defense in their answers (ROA.173, ROA.179, ROA.185), their motion for summary judgment did not invoke qualified immunity, ROA.285-295.

The district court ultimately granted the motion for summary judgment on all claims except the forcible medication claim against Dr. Kuiper. ROA.2283-ROA.2303. The court dismissed the claims against MDC as barred by sovereign immunity, and granted judgment in favor of Centurion for lack of evidence of a policy or practice, as required for vicarious liability. ROA.2294, ROA.2296. The court also granted summary judgment in favor of several individual defendants on the forcible medication claim for failure to exhaust administrative remedies under the Prison Litigation Reform Act (PLRA).

The court denied summary judgment, however, regarding the forcible medication claim against Dr. Kuiper because administrative remedies had been exhausted against him, and the only evidence submitted in support of Dr. Kuiper's motion was his own declaration stating that that there was a "risk of harm to self and others." ROA.2302. From a substantive due process perspective, "there [was] no factual circumstance laid out … to illuminate" the alleged risk "beyond general disruptiveness," so the court could not "conclude that Pinkston was a danger to himself or others so as to justify administration of" forced medication. ROA.2302. And regarding procedural due process, the court held that there were "disputed material facts as to … whether a sufficient emergency existed to forego any procedural protections." ROA.2303.

Dr. Kuiper subsequently moved for reconsideration of the court's summary judgment ruling, relying on new deposition testimony from Leatha Barron, an MSP nurse and Dr. Kuiper's former co-defendant. ROA.2531. That reconsideration motion again did not invoke qualified immunity. ROA.2531-2538. The court denied reconsideration, concluding that the new evidence "could (and should) have been presented during (and obtained before) the initial phase of summary judgment briefing." ROA.2661.

### 2. First Evidentiary Hearing And The Magistrate Judge's Report and Recommendation

On May 23, 2019, the magistrate judge held an evidentiary hearing at which Mr. Pinkston was not present. ROA.2666. An MSP transportation official asserted that Mr. Pinkston "refus[ed] to leave his cell unless he was given a haircut" (ROA.2689), but Mr. Pinkston promptly disputed that claim in a motion for contempt filed later that day, which stated that MSP personnel had not let him attend the hearing and had lied about the reason for his absence. ROA.2684-2685. According to Mr. Pinkston, he had "never refused" to attend the hearing; he instead simply asked the transportation officers to check on his getting a haircut because he wanted to look presentable in court. *See* ROA.2684-2687.

The magistrate judge denied Mr. Pinkston's motion, crediting the prison official's telephonic testimony over Mr. Pinkston's statements concerning his own intentions. ROA.2695. The magistrate judge accordingly considered the evidence

presented in Mr. Pinkston's absence, and based on that evidence, issued a report

and recommendation that judgment be entered in Dr. Kuiper's favor, for two

reasons. ROA.2700-2702. First, the magistrate judge recommended that the "case

should be dismissed for … failure to prosecute" because "[Mr.] Pinkston

voluntarily absented himself from the evidentiary hearing." ROA.2700. Second,

the magistrate judge alternatively found that the "undisputed testimony" at the

hearing established that Mr. Pinkston was "having difficulty regulating his

behavior on September 14, 2016," such that forcible medication was in his "best

interests at the time" and "necessary to avert a potential crisis with the other

inmates and staff." ROA.2701. The magistrate judge did not find that Mr.

Pinkston presented a danger to himself or others at the time he was forcibly

drugged. *See* ROA.2696-2702. Instead, the magistrate judge held that "[i]t would

be unreasonable to conclude that Dr. Kuiper should have waited until Pinkston

harmed himself or created a more dangerous environment for other inmates in

fragile mental conditions prior to forcibly medicating." ROA.2701. Mr. Pinkston

promptly filed written objections. ROA.2715-2776.

### 3.     Rejection Of The Report And Recommendation

On May 21, 2020, the district court set aside the magistrate judge's denial of

the motion for contempt because the magistrate judge had failed to certify to the

district court the requisite factual predicate for disposing of the motion. ROA.2836

(citing *Deutsch v. Annis Enters., Inc.*, 882 F.3d 169, 174 n.3 (5th Cir. 2018)). The district court held a four-hour evidentiary hearing concerning the report and recommendation and contempt motion. ROA.2873.

The evidence presented at that hearing was "conflicting." ROA.2879. Five MSP officials, including the one who had appeared telephonically before the magistrate judge, testified that Mr. Pinkston refused to attend the hearing unless he received a haircut. ROA.3133-3192. Mr. Pinkston testified, however, that he told transportation officers on the morning of the hearing that he was "getting ready for court" and asked them to "check with the Captain" about getting him a haircut because the deputy warden had told him a day earlier that he could get a haircut before the hearing. ROA.3095-3096. As Mr. Pinkston explained, he wanted to look "presentable" in court and not like a "crazy person." ROA.3097. He reiterated multiple times to prison personnel, though, that he was "not refusing [to attend] at all." ROA.3096-3098. Mr. Pinkston further testified that he was ready to leave by 4:55 a.m., but that the transportation officers never returned to his cell. ROA.3098. He then asked other officers to "inform the transportation officers that he was willing to attend the hearing," but those officers "informed Pinkston that the transportation officers said they could not take Pinkston because it was 'too late.'" ROA.2880; *see also* ROA.3099.

In a written order following the hearing, the district court determined that any waiver of Mr. Pinkston's right to attend had to be "knowing, voluntary, and intelligent." ROA.2883. No evidence of such a waiver existed in this case because of the "conflicting credible testimony, as well as the fact that Pinkston ha[d] actively pursued this litigation for approximately three years." ROA.2883. Accordingly, because "no … waiver occurred," the court concluded that "disposing of Pinkston's claims based on the evidentiary hearing at which Pinkston was absent would be error." ROA.2883.[1]

### 4. Second Evidentiary Hearing And Final Judgment

The district court itself held a second evidentiary hearing on the merits of Mr. Pinkston's claims on October 15, 2020, ROA.2923, which continued on October 20 and November 4 before concluding on November 18. ROA.2926, ROA.2944, ROA.2963. During the hearing, Mr. Pinkston testified on his own behalf and called as witnesses three of his family members, a former MSP inmate, and Dr. Kuiper. ROA.2987-2997. Excerpts from Nurse Barron's deposition were also admitted. ROA.2998-2999. And Dr. Kuiper testified again during his defense case, ROA.2994-2997, though the district court limited Dr. Kuiper's testimony to

---

[1] In light of the conflicting testimony, the court further concluded that "a finding of contempt [was] inappropriate" because Mr. Pinkston had not "shouldered his burden of establishing by clear and convincing evidence that he was prevented from attending" the hearing. ROA.2884.

his observations while treating Mr. Pinkston and excluded more general testimony about psychiatry because Dr. Kuiper had not been qualified as an expert and, indeed, is not a psychiatrist. ROA.3540-3541, ROA.3818-3820. The court further found that Dr. Kuiper's testimony "during direct and re-direct examination" warranted "skepticism" because most of it "was the result of questions by counsel which were undisputedly 'leading.'" ROA.2994.

On March 30, 2021, the district court issued a memorandum opinion laying out its factual findings (*supra* pp. 4-7) and conclusions of law. ROA.2986-3010. Beginning with substantive due process, the court explained that the inquiry focuses on "whether the decisionmaker 'had enough evidence to demonstrate that [the plaintiff] was a danger to himself or others so as to justify' the use of the medication which was administered." ROA.3005 (alteration in original) (quoting *Perry v. Sims*, 990 F.3d 505, 512 (7th Cir. 2021)). In this case, the court explained, the answer was no, because it was "undisputed that Pinkston was locked in his cell during the entirety of his outburst, such that he posed no sincere threat of harm to staff nor to other inmates." ROA.3006. "Pinkston's fellow inmates," moreover, "were also locked in their cells and there [was] no indication that the actions of these inmates … posed a risk of harm to anyone." ROA.3006. Thus, the evidence at most showed "a *loud* disruption," but "loud noise in the ward was not exactly unusual, according to some of the testimony." ROA.3006. And loud noise

certainly did "not support a finding that Pinkston posed a threat of harm to himself, others or property." ROA.3006. "The forcible administration of the Haldol and Benadryl, therefore, violated Pinkston's substantive due process rights." ROA.3006.

Turning to procedural due process, the district court explained that the Constitution generally requires "that the tribunal or panel approving the medication must exercise independent judgment and take into account the inmate's best interest and that the inmate have an adequate opportunity before the tribunal to object to the medication." ROA.3007. Although "a prisoner is not entitled to such procedural protections when the circumstances suggest that he poses 'such an imminent and serious danger to himself or others' that the defendant could not comply" with the procedural requirements, ROA.3007 (quoting *Kulas v. Valdez*, 159 F.3d 453, 456 (9th Cir. 1998)), the court concluded that "emergency standard" was not satisfied in this case, ROA.3008. Although Mr. Pinkston was "loud and disruptive," that "does not rise to the level of an emergency." ROA.3008. Accordingly, Mr. Pinkston "was entitled to a hearing and an opportunity to be heard before being forcibly medicated," and Dr. Kuiper's "refusal to provide" those protections violated procedural due process. ROA.3008.

Despite finding multiple constitutional violations, the district court declined to award Mr. Pinkston compensatory damages because "[b]ased on the evidence

presented, … Pinkston failed to prove that the injuries he complained of … were *caused* by the medications forcibly administered." ROA.3009-3010. Thus, in entering final judgment in Mr. Pinkston's favor, the court limited its relief to $100 in nominal damages, ROA.3010, and an additional $350 in costs (which represented the filing fee for the action), for a total judgment of $450, ROA.3060. This appeal followed. ROA.3063.

## SUMMARY OF ARGUMENT

The district court committed no error in this case. It properly conducted a four-day evidentiary hearing, appropriately considered the evidence submitted, and applied the correct legal standard. Under that standard, the court rightly concluded that Dr. Kuiper violated Mr. Pinkston's substantive due process rights by drugging him against his will when he was not a danger to himself or others. The court also correctly determined that Dr. Kuiper separately violated Mr. Pinkston's procedural due process rights because he failed to provide Mr. Pinkston any procedural protections whatsoever before administering the drugs.

None of Dr. Kuiper's arguments to the contrary has merit. First, his primary contention (at 30-47) that the district court applied the wrong legal standard fails because any factual differences between this case and *Washington v. Harper*, 494 U.S. 210 (1990), do not render *Harper*'s framework inapplicable. Second, Dr. Kuiper's contention that the district court improperly weighed the evidence lacks

merit because he offers no contemporaneous evidence of dangerousness that the district court failed to consider.

Lastly, Dr. Kuiper's evidentiary challenge fails because the district court was right to exclude his testimony about purported background psychiatry principles given that he had not been qualified as an expert and is not a psychiatrist. Any error on that issue also would have been harmless because the testimony does not go to the dispositive issue—that Mr. Pinkston was not dangerous. The judgment should accordingly be affirmed.

## STANDARD OF REVIEW

When a prisoner brings claims subject to the PLRA and does not demand a jury trial, the court may instead hold "an expanded evidentiary hearing," sometimes referred to as a *Flowers* hearing. *See McAfee v. Martin*, 63 F.3d 436, 437-438 & n.1 (5th Cir. 1995) (quotation marks omitted) (citing *Flowers v. Phelps*, 956 F.2d 488 (5th Cir. 1992)). That hearing "'amounts to a bench trial replete with credibility determinations and findings of fact.'" *Ashford v. United States*, 511 F.3d 501, 504 (5th Cir. 2007). The district court's legal conclusions are "reviewed de novo, and its factual findings are reviewed for clear error." *Adkins v. Kaspar*, 393 F.3d 559, 563 (5th Cir. 2004).

"Reversal is warranted under clear error review only if the court is 'left with the definite and firm conviction that a mistake has been committed.'" *Barto v.*

*Shore Const., LLC*, 801 F.3d 465, 471 (5th Cir. 2015). In other words, this Court does not "reverse the findings of the trial judge simply because" it "would or could decide the case differently." *Guzman v. Hacienda Records & Recording Studio, Inc.*, 808 F.3d 1031, 1036 (5th Cir. 2015). Moreover, "the clearly erroneous standard of review … requires even 'greater deference to the trial court's findings when they are based upon determinations of credibility.'" *Id.* Indeed, as the Supreme Court has held, "when a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error." *Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985); *see also Guzman*, 808 F.3d at 1036.

Evidentiary rulings are reviewed for abuse of discretion. *North Cypress Med. Ctr. Operating Co. v. Aetna Life Ins. Co.*, 898 F.3d 461, 476 (5th Cir. 2018). "Even if the court abused its discretion, the error is reviewed under the harmless error doctrine" and "is reversible only if it affected a party's substantial rights." *Id.* (quotation marks omitted).

# ARGUMENT

## I. MR. PINKSTON HAS A SIGNIFICANT LIBERTY INTEREST IN AVOIDING INVOLUNTARY ADMINISTRATION OF ANTIPSYCHOTIC DRUGS

### A. *Harper*'s Due Process Framework Governs This Case

The Supreme Court held in *Washington v. Harper* that prisoners, as part of their fundamental right to bodily integrity, have "a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment." 494 U.S. 210, 221-222 (1990); *see also, e.g.*, *Guertin v. State*, 912 F.3d 907, 919-920 (6th Cir. 2019) (citing *Harper* as a bodily-integrity case); *Johnson v. Meltzer*, 134 F.3d 1393, 1396-1397 (9th Cir. 1998) (same). In reaching that conclusion, the Court explained that "the forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty." 494 U.S. at 229. That is particularly true, the Court stressed, in cases involving antipsychotic drugs, because the purpose of those drugs "is to alter the chemical balance in a patient's brain, leading to changes … in his or her cognitive processes." *Id.* And despite "the therapeutic benefits of antipsychotic drugs," they can also "have serious, even fatal, side effects." *Id.*

Against this backdrop, *Harper* explained that forcible administration of antipsychotic drugs implicates two legal distinct issues. *Harper*, 494 U.S. at 220. First, "the substantive issue" is "what factual circumstances must exist before the State may administer antipsychotic drugs." *Id.* Second, "the procedural issue" is

"whether the State's nonjudicial mechanisms used … in a particular case are sufficient" for determining that that "the individual's liberty interest actually is outweighed" by the "competing state interests." *Id.*

In addressing the substantive question, the Court first examined the Washington state policy at issue, which provided that an inmate could "be subject to involuntary treatment with drugs only if he (1) suffers from a 'mental disorder' and (2) is 'gravely disabled' or poses a 'likelihood of serious harm' to himself, others, or their property." *Harper*, 494 U.S. at 215, 221-222. That policy informed the substantive inquiry because it "create[d] a justifiable expectation on the part of the inmate that the drugs [would] not be administered unless those conditions exist." *Id.* at 222. But even without such a policy, the Court explained that the "constitutional requirements" required a standard that accounted for both the nature of the liberty intrusion, on the one hand, and the state's "interest in combatting … danger" and "obligation to provide prisoners with medical treatment," on the other. *Id.* at 225. Guided by those considerations, the Court ultimately held that "the Due Process Clause permits the State to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will" if (1) "the inmate is dangerous to himself or others," and (2) "the treatment is in the inmate's medical interest." *Id.* at 227.

Turning to the procedural question, *Harper* applied the familiar test from *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), under which courts "'consider the private interests at stake … , the governmental interests involved, and the value of procedural requirements in determining what process is due.'" *Harper*, 494 U.S. at 229. Those factors, the Court explained, did not necessarily require the approval of a court before an inmate was forcibly medicated; rather, "an inmate's interests are adequately protected, and perhaps better served, by allowing the decision to medicate to be made by medical professionals." *Id.* at 231. The Court stressed, however, that "[a] State's attempt to set a high standard for determining when involuntary medication with antipsychotic drugs is permitted cannot withstand challenge if there are *no procedural safeguards* to ensure the prisoner's interests are taken into account." *Id.* at 233 (emphasis added). Thus, some kind of "independent[t] … decisionmaker" is required—a doctor "involved in the inmate's current treatment or diagnosis" is not enough. *Id.*

Moreover, the Court reasoned that inmates must be provided a meaningful opportunity to be heard before "the actual decision is made"—which Washington state allowed for by "provid[ing] for notice, the right to be present at an adversary hearing, and the right to present and cross-examine witnesses." 494 U.S. at 235. Finally, the Court stressed that Washington inmates could "obtain judicial review

of the hearing committee's decision" and that the "record compiled" by the procedures "was adequate to allow such review." *Id.*

In sum, as the Court confirmed in a later decision, *Harper* instructs that "forcing antipsychotic drugs on a convicted prisoner is impermissible absent a finding of overriding justification and a determination of medical appropriateness" by an independent decisionmaker, with a meaningful opportunity for the prisoner to contest the decision. *See Riggins v. Nevada*, 504 U.S. 127, 135 (1992).

Those principles decide this case. Like the inmate in *Harper*, Mr. Pinkston had a preexisting mental-health diagnosis, *see* 494 U.S. at 214, but *Harper* makes clear that that alone does not permit the prison to forcibly medicate him. Both cases likewise involve the administration of Haldol, an "antipsychotic drug" that "alter[s] the chemical balance in the brain." *Id.* at 214 & n.1. And similar to the Washington policy in *Harper*, the Mississippi Department of Corrections has issued a policy providing that "anti-psychotic medications will be administered involuntarily only when" it has been "demonstrated that the offender is suffering from a mental disorder and is of unsound mind, and as a result of the disorder constituted *a likelihood of serious harm to him or others,* property destruction, or is gravely disabled." ROA.454-455 (emphasis added).[2] That policy, as in *Harper*,

---

[2] "Gravely Disabled" is defined by the policy as "[a] condition in which a person, as a result of a mental disorder is in danger of serious physical harm resulting from a failure to provide for his essential human needs of health or safety; or in which a

informs the due process inquiry by giving inmates a reasonable expectation about when drugs can be forcibly administered and when they cannot.

And *Harper* remains equally applicable even though it involved an ongoing course of treatment rather than a single instance of forcibly administered medication. *Harper* never defined the liberty interest through reference to long-term treatment—for good reason. Even one "forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty," given the effects of that one injection on brain chemistry and the possibility of "serious, even fatal, side effects." 494 U.S. at 229. Thus, the "factual circumstances" that "must exist before the State may administer antipsychotic drugs" are not reduced when treatment is contemplated for only a limited period of time. *Id.* at 220. If anything, a *heightened* showing of danger may be required in supposed emergency situations where more spontaneous, short-term drug administration is contemplated. Indeed, that is the expectation provided by Mississippi's forcible medication policy. That policy permits certain procedures to be avoided in "medically emergent situations," but it requires that "a

---

person manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his action and is not receiving such care as is essential for his health or safety." ROA.454.

licensed physician or psychiatrist" find that the inmate "presents an *imminent* likelihood of serious harm" (not merely a likelihood).  ROA.454 (emphasis added).

As for the procedural inquiry, *Harper*'s core holding is that the extent of pre-deprivation process required in forcible medication cases is determined through the *Mathews* test.  *See Harper*, 494 U.S. at 229.  That test is grounded in the premise that "'[d]ue process is flexible and calls for such procedural protections as the particular situation demands,'" *Mathews*, 424 U.S. at 334, but in nearly all circumstances it "requires some kind of a hearing *before* the State deprives a person of liberty," *Zinermon v. Burch*, 494 U.S. 113, 127 (1990).

Consistent with that prevailing rule, this Court has assumed, albeit in an unpublished opinion, that "the type of notice and hearing required under *Harper*" would be "trigger[ed]" in cases where a defendant refused even short-term antipsychotic medical treatment.  *See Bagley v. Smith*, 132 F.3d 1455, 1997 WL 802857, at *1, *4 (5th Cir. 1997) (inmate challenging forcible medication during six-day mental health evaluation).  Another court of appeals, moreover, has held that "notice and the right to … participate in a hearing" are required before the medication is administered unless the inmate poses "such an imminent and serious danger to himself or others that the minimal procedural requirements of *Harper* … could not be met."  *Kulas v. Valdez*, 159 F.3d 453, 456 (9th Cir. 1998).  In other words, genuine emergency circumstances may sometimes affect the amount of

process that is due.  But that does not mean, contrary to Dr. Kuiper's contention (at

39-40), that prison doctors can forcibly inject inmates in any one-off situation

without *any* process when there is no actual emergency.

### B.    Dr. Kuiper's Proposed "Professional Judgment" Standard Contravenes *Harper* And Would Essentially Eliminate The Constitution's Protection Against Forcible Medication

Despite *Harper*'s clear instructions, Dr. Kuiper seeks to limit it to long-term,

recurring treatment.  For one-time or otherwise short-term forcible medication, he

argues for an entirely different standard under which *both* substantive and

procedural due process claims would require the plaintiff to show that the

defendant "'didn't exercise professional judgment.'"  Appellant Br. 36.  As Dr.

Kuiper articulates it, that standard would effectively transform Mr. Pinkston's

constitutional claim into a claim for medical malpractice, as it would require him

to "'present expert testimony to establish the applicable standard of care and to

show how the care he received breached that standard.'"  Appellant Br. 53 (quoting

*Jenkins v. United States*, 857 F. App'x 820, 821 (5th Cir. 2021)).

Dr. Kuiper relies almost exclusively on one out-of-circuit decision in support

of this argument, *Hogan v. Carter*, 85 F.3d 1113 (4th Cir. 1996) (en banc).  That

case is plainly distinguishable both legally and factually.  First, *Hogan* involved a

qualified immunity defense, so "the *sole question*" was whether the defendant

"violated clearly established law" in 1992 by "order[ing] that Hogan be

administered the single emergency dose of Thorazine." *Id.* at 1115 (emphasis

added). Here, by contrast, Dr. Kuiper has not asserted a quality immunity defense.

*Supra* pp. 7-9.[3] Mr. Pinkston therefore has no burden to show that Dr. Kuiper's

conduct violated clearly established precedent. Instead, the question is merely

whether *Harper*'s reasoning logically applies in these circumstances. For the

reasons provided above (at 21-24), it does.

There are also meaningful factual differences between this case and *Hogan*.

In the weeks leading up to the incident at issue, Mr. Hogan had previously

"attempted suicide" and "attempted to assault a physician." 85 F.3d at 1114.

"Only three days earlier," he himself requested and received a 50 mg dose of

Thorazine. *Id.* at 1115 n.1. And the events in question took place at 1:45 in the

morning, when Mr. Hogan had been in the "throes of an uncontrollable seizure for

some three hours and was at risk of seriously injuring himself." *Id.* at 1114. Those

facts underlay the Fourth Circuit's characterization—in dictum—that Dr. Carter

acted "consistent with accepted professional judgment." *Id.* at 1117. None of

those facts is present in Mr. Pinkston's case.

---

[3] Though Dr. Kuiper pled qualified immunity in his answer, he never asserted it in any subsequent stage of the proceedings, including in his opening brief on appeal. In such circumstances, the defense has been forfeited. *Peterson v. Wilson*, 141 F.3d 573, 579 n.21 (5th Cir. 1998); *see also Stevens v. St. Tammany Parish Gov.*, 17 F.4th 563, 574 (5th Cir. 2021) ("An appellant abandons all issues not raised and argued in its initial brief on appeal.").

Apart from *Hogan*, Dr. Kuiper cites only one other forcible medication case applying a purported "professional judgment" standard—another one from the Fourth Circuit, but this time unpublished and not precedential. *See* Appellant Br. 36 (citing *Farabee v. Yaratha*, 801 F. App'x 97, 108 (4th Cir. 2020)). As Dr. Kuiper notes (at 37), the "Fourth Circuit views" these decisions "as an application of the standard the Supreme Court announced in *Youngberg v. Romeo*," 457 U.S. 307 (1982). That, however, only further demonstrates why the "professional judgment" standard should not be applied here.

Rather than involving an *intrusion* into an individual's bodily integrity, *Youngberg* involved claims that state actors had *failed to act* in a sufficient manner to protect the "liberty interests in safety and freedom from bodily restraint." 457 U.S. at 319. That kind of denial-of-care claim, *Youngberg* held, turns on whether "professional judgment in fact was exercised." *Id.* at 321. Yet given the numerous factual similarities to *Harper* here (*supra* pp. 21-22), there is no reason the standard for more open-ended denial-of-care claims should apply instead. Dr. Kuiper suggests (at 37-38) that *Youngberg* has newfound relevance in cases involving short-term administration of antipsychotic medication, but that logic makes no sense: Like *Harper*, *Youngberg* also involved long-term, recurring treatment (for an intellectually disabled individual who had been civilly committed

indefinitely). Thus, if *Harper* is distinguishable on that basis—as Dr. Kuiper urges—then *Youngberg* is too.

Moreover, *Harper*'s framework already accounts for *Youngberg*. *Harper* cited *Youngberg* to support its conclusions that medical professionals (as opposed to judges) could decide to administer antipsychotic drugs, and that formal evidentiary rules and a heightened standard of proof were unnecessary. *See* 494 U.S. at 231, 235. With respect to *those* procedures, the Court concluded that the decisionmakers' professional medical judgment provided adequate protection. The Court refused, though, to allow professional judgment to be the *only* protection.

Finally, Dr. Kuiper's proposed standard would in essence give prison personnel free reign to forcibly medicate inmates with antipsychotic drugs, so long as it was outside of the long-term treatment context. According to Dr. Kuiper, a prison doctor would not need to find that the plaintiff was a danger to himself, others, or property (Appellant Br. 46-47, 59); the law would not require any independent medical decisionmaker or neutral review mechanism either pre- or post-injection, even if such a mechanism was feasible under the circumstances (*e.g.*, *id.* at 44); and it would not require the development of any contemporaneous documentary record supporting the decision to forcibly medicate so as to enable meaningful judicial review (*see id.* at 39). By contrast, despite the possible absence of a contemporaneous record, incarcerated plaintiffs would be required to

retain their own medical experts and somehow disprove the defendant's

professionalism. Appellant Br. 53-54. Dr. Kuiper's standard would, in other

words, effectively eviscerate prisoners' rights to refuse unwanted medical

treatment, and place those prisoners' important medical decisions and bodily

integrity entirely at the discretion of prison personnel, unencumbered by any

substantive standard or need to justify their decisions. Dr. Kuiper cites no court

that has ever reached such a decision, and this Court should not be the first.[4]

## II.  DR. KUIPER VIOLATED MR. PINKSTON'S SUBSTANTIVE AND PROCEDURAL DUE PROCESS RIGHTS

Applying the correct legal standard from *Harper*, the district court's rulings

on both substantive and procedural due process were correct. The evidence

established that Mr. Pinkston was not a danger to himself, others, or property, and

that there was no basis for discarding all forms of pre-deprivation process.

---

[4] Contrary to Dr. Kuiper's contention (at 41), a "professional judgment" standard is not necessary to prevent the Constitution from becoming "a fount of negligence liability." As the Fourth Circuit's decision in *Hogan* demonstrates, qualified immunity provides sufficient protection to ensure that state actors are not exposed to expansive damages liability.

### A. Mr. Pinkston Had A Substantive Right To Refuse Antipsychotic Medication Because He Was Not A Danger To Himself Or Others

#### 1. The District Court's Factual Findings Were Not Clearly Erroneous, And Its Legal Conclusion Was Correct

As noted, the substantive due process inquiry turns on whether (1) "the inmate is dangerous to himself or others," and (2) "the treatment is in the inmate's medical interest." *Harper*, 494 U.S. at 227. Here, the district court's judgment relied solely on the first point, so that is the only question now at issue.

In concluding that Mr. Pinkston was not a threat of harm to himself, others, or property, the district court made a number of factual findings, most of which Dr. Kuiper does not challenge. The court found, for example, that Mr. Pinkston's only documented diagnosis at the time was Narcissistic Personality Disorder, which did not require treatment with any medication. ROA.2995; ROA.3001. The court also found that Mr. Pinkston had never previously assaulted anyone or caused any property damage while incarcerated. ROA.3001. He had "exhibited manipulative, oppositional, demanding, and hostile behavior at times" and engaged in hunger strikes at prior facilities. ROA.3001. But given the other aspects of Mr. Pinkston's history, the court found that the hunger strikes were "done to bring attention to issues, both personal and institutional, which [he] believed needed to be addressed and resolved." ROA.3001. Again, Dr. Kuiper does not dispute any

of these factual findings, much less contend that they were clearly erroneous, *supra* pp. 16-17.

The district court's factual findings then detailed the events of September 14. After waking up to discover boils on his skin, Mr. Pinkston "immediately sought medical attention but was unable to procure such help." ROA.3001. "This lack of medical treatment caused Pinkston to become upset as he began yelling, threatening the staff in some form, and beating on his cell door, all while confined in his cell." ROA.3001. The court noted Dr. Kuiper's and Nurse Baron's testimony that, during the course of his outburst, Mr. Pinkston made comments about wanting to "knock … out" various staff members and that he "should kill" them. ROA.2987; ROA.2999; *see also* ROA.3296. Mr. Pinkston's attempts to get the staff's attention also "stirred up his fellow inmates." ROA.3001. But all inmates, including Mr. Pinkston, remained confined in their cells throughout. *See* ROA.3001.

Dr. Kuiper does not meaningfully dispute these findings, either. His account of the evidence (Appellant Br. 56-58), which he himself admits is "repetitive" (*id.* at 58), is largely cumulative of what the district court already found. Indeed, none of the evidence that Dr. Kuiper cites contradicts the district court's findings, and his additional factual assertions amount to retrospective hypothesizing that plainly does not support a finding of dangerousness. For example, Dr. Kuiper points to his

own testimony that Mr. Pinkston "*could*" have "harm[ed] others by 'violence' *if* 'security guards came in' [his] cell," Appellant Br. 56 (emphasis added) (quoting ROA.3572)—though in fact, Mr. Pinkston did not attempt to harm the guards who ultimately did enter his cell to forcibly drug him, *see* ROA.1333; ROA.2998; ROA.3002; ROA.3373.  Dr. Kuiper further points to testimony that Mr. Pinkston *could* have "knock[ed] his head on a wall" or "drown[ed] himself in a toilet" (ROA.3570-3571; *see also* Appellant Br. 56), even though it is undisputed that Mr. Pinkston did not even attempt do either of those things.  And Dr. Kuiper references testimony discussing a supposedly prototypical "patient on 'a suicide watch'" and how disruptive conduct "'could really drive [such a patient] that way'" (whatever "that way" means), without identifying any evidence that any such patient was anywhere near Mr. Pinkston or that such a risk *actually* existed on September 14. Appellant Br. 57 (quoting ROA.3574-3575).

Dr. Kuiper's underdeveloped hypotheticals do not provide a "'definite and firm conviction'" that the district court erred in assessing the evidence.  *United States ex rel. Vavra v. Kellogg Brown & Root, Inc.*, 848 F.3d 366, 375 (5th Cir. 2017).  That is particularly true given that the district court's assessment involved an adverse credibility determination based on Dr. Kuiper's direct and re-direct examination, which the court found questionable because it heavily involved leading questions.  ROA.2994; *cf. Stine v. Marathon Oil Co.*, 976 F.2d 254, 266

(5th Cir. 1992) (explaining that "leading questions must not be allowed in controverted substantive areas" where the factfinder "must weigh the evidence and make credibility determinations").[5]  Credibility determinations such as this one "'can virtually never be clear error,'" *Guzman v. Hacienda Records & Recording Studio, Inc.*, 808 F.3d 1031, 1036 (5th Cir. 2015)—and Dr. Kuiper does not establish how the district court's determinations rise to such a level here.

Moreover, the only other corroborating witness Dr. Kuiper cites *supports* the district court's view of the evidence.  Nurse Barron's deposition testimony stated that the inmates had become "'so loud … that you could hear them downstairs,'" and that the "situation became 'difficult for staff to manage.'"  Appellant Br. 58; *see also* ROA.2552.  That is fully consistent with the district court's characterization of the incident as "a *loud* disruption."  ROA.3006.  Nothing in that testimony suggests that any inmate or staff member was actually in danger, given that all inmates were confined in their cells.

Having properly assessed the facts, the district court reached the correct legal conclusion that "the evidence presented does not support a finding that

---

[5] Indeed, Dr. Kuiper's hypothesizing about a patient on suicide watch came after a question from counsel stating:  "Dr. Kuiper, I believe we discussed there were some patients with dementia.  There was a paranoid schizophrenic patient as well as someone on suicide watch.  So can you speak specifically how Mr. Pinkston's behavior could significantly impact them?"  ROA.3575.

Pinkston posed a threat of harm to himself, others, or property." ROA.3006. Case law involving forcible medication in circumstances similar to these is sparse—which in and of itself demonstrates that the decision to medicate here was an overreach and a departure from typical practices. What case law there is shows that being "loud and uncooperative" does not make an inmate dangerous for purposes of *Harper*. *Kulas*, 159 F.3d at 456; *see also Brandt v. Monte*, 626 F. Supp. 2d 469, 484 (D.N.J. 2009) (forcible medication for "commonplace behaviors" such as "raising one's voice" would not satisfy *Harper*'s substantive due process standard). Mr. Pinkston's empty verbal threats from inside his locked cell did not render him a danger either, especially given that he had a history of making such threats without ever becoming violent. *Supra* p. 29. Indeed, in cases where inmates were actually provided a *Harper* hearing before independent medical decisionmakers, similar threats were found insufficient to support a dangerousness finding. *See United States v. Mann*, 532 F. App'x 481, 483-484 (5th Cir. 2013) (medical decisionmakers concluded that individual who sent threatening faxes to federal courts "did not meet the criteria for involuntary treatment pursuant to *Harper* because he was not a danger to himself or others"); *United States v. Gutierrez*, 443 F. App'x 898, 899-900 (5th Cir. 2011) (same, where individual had threatened to kill public officials and "displayed grandiose and paranoid delusions, had disorganized speech, and was hostile in interactions

with the doctors").  If disruptive speech alone justified the administration of antipsychotic medication, forcible injections would be a daily occurrence in prisons across America.  Such injections are instead rare, and properly so.

The district court's conclusion finds further support in cases where *Harper*'s substantive standard was satisfied, as those cases involve facts far afield from these.  For example, in *Fuller v. Dillon*, 236 F.3d 876, 881 (7th Cir. 2001), the inmate "thought he was being poisoned, experienced auditory hallucinations, and tried to kill himself on two occasions by lighting himself on fire."  Similarly, in *Perry v. Sims*, 990 F.3d 505, 509 (7th Cir. 2021), the inmate had stopped taking medication previously prescribed to him, "stopped eating because he feared someone had poisoned his food," and "threatened to kill himself if left in his cell any longer."  And in *Doe v. Dyett*, 1993 WL 378867, at *3 (S.D.N.Y. Sept. 24, 1993), the plaintiff had previously "assaulted two corrections officers," "bang[ed] his head" in his cell, "cut himself with a pen," and "attempted to electrocute himself by standing on a metal sink and reaching for the overhead light."  The facts of these cases are all far removed from the facts of Mr. Pinkston's.

For these reasons, the district court correctly concluded that Mr. Pinkston was not "dangerous to himself or others."  *Harper*, 494 U.S. at 227.  Under *Harper*, that conclusion is dispositive of the substantive due process inquiry.

## 2. The District Court Did Not Improperly Shift The Burden To Dr. Kuiper

Contrary to Dr. Kuiper's contentions (at 45-47), the district court's application of the *Harper* standard and its assessment of the evidence did not "remove[]" Mr. Pinkston's "burden of proving a constitutional violation." Mr. Pinkston still had to present a case-in-chief, in which he called six witnesses, including Dr. Kuiper and himself. *See* ROA.2987-2994. The testimony of those witnesses established that Mr. Pinkston was injected with Haldol and Benadryl (ROA.3311); that Mr. Pinkston had not been prescribed any psychotropic or antipsychotic medications at the time (ROA.3486-3487); that Dr. Kuiper gave the order to inject Mr. Pinkston with the drugs (ROA.3311); and that Mr. Pinkston did not consent to the injection (ROA.3314). Moreover, at multiple points during his case-in-chief, Mr. Pinkston elicited from Dr. Kuiper the purported basis for his decision (*e.g.*, ROA.3294-3296, ROA.3312, ROA.3314-3319), to the point that Dr. Kuiper felt that he was being asked to "repeat" himself, ROA.3315. Based on this evidence that he himself submitted, Mr. Pinkston was free to argue that his constitutional rights were violated.

In other words, the district court never required Dr. Kuiper to prove anything. Although the ultimate inquiry was "whether the decisionmaker 'had enough evidence to demonstrate that [the plaintiff] was a danger to himself or others,'" ROA.3005, the *burden* was on Mr. Pinkston to show the absence of such

evidence.  And Mr. Pinkston carried that burden, as the district court found.  Of course, Mr. Pinkston was entitled to ask questions of Dr. Kuiper that probed Dr. Kuiper's basis for his decisions—that is not burden-shifting, but rather a permissible means of carrying Mr. Pinkston's burden.  Indeed, the Supreme Court has explained that "[u]nder *Harper*, forcing antipsychotic drugs on a convicted prisoner is impermissible absent a finding of *overriding justification*."  *Riggins*, 504 U.S. at 135; *see also, e.g.*, *Kulas*, 159 F.3d at 456 ("such an invasion of the human person can only be justified by a determination by a neutral factfinder that the antipsychotic drugs are medically appropriate and that the circumstances justify their application"); *Sullivan v. Flanigan*, 8 F.3d 591, 597 (7th Cir. 1993) ("*Harper* made it the state's burden to justify forced drugging of prisoners and allowed prisoners to present evidence in their own defense.").

   This does not mean that *Harper* amounts to strict scrutiny either.  *Contra* Appellant Br. 30.  Consistent with *Harper*, the district court applied rational basis review.  *See* ROA.3004-3005; *Harper*, 494 U.S. at 223; *see also Turner v. Safley*, 482 U.S. 78, 89 (1987) ("[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests.").  And under rational basis review, although the government has "no affirmative evidentiary burden," "plaintiffs may nonetheless negate a seemingly plausible basis" for the governmental action.  *St. Joseph Abbey v.*

*Castille*, 712 F.3d 215, 223 (5th Cir. 2013) (citing *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314-315 (1993)).  That is exactly what Mr. Pinkston did:  The evidence that he presented was sufficient to negate the only conceivable basis for Dr. Kuiper's decision to forcibly medicate—that Mr. Pinkston was supposedly dangerous.  Thus, even under rational basis review, Dr. Kuiper's actions do not pass constitutional muster.[6]

**B.   Dr. Kuiper Violated Mr. Pinkston's Procedural Due Process Rights By Failing To Provide Any Pre-Deprivation Process**

The district court also correctly held that Dr. Kuiper violated Mr. Pinkston's procedural due process rights.  On that issue, the dispositive fact is that Mr. Pinkston was not provided *any* process whatsoever before he was forcibly injected.  As the district court found, Dr. Kuiper did not provide Mr. Pinkston a single one of the pre-deprivation procedural protections endorsed in *Harper*.  ROA.3002.  He did not attempt to engage any independent decisionmaker uninvolved in Mr. Pinkston's "current treatment or diagnosis."  494 U.S. at 233; *see also* ROA.3002.

---

[6] There is some uncertainty as to whether *Turner*'s "reasonably related" standard should apply here anyway.  The standard typically applies to claims that "[p]rison *regulations ...* impinge on fundamental constitutional rights."  *Freeman v. Texas Dep't of Criminal Justice*, 369 F.3d 854, 860 (5th Cir. 2004) (emphasis added).  It is not clear why prison personnel should be entitled to the same deference in cases like this one, where the plaintiff asserts that the constitutional infringement also violated prison policy.  *See supra* p. 21 (Mississippi policy prohibits forcible medication absent finding of dangerousness).  The Court need not reach that question in this case, though, because as noted above, Dr. Kuiper's actions fail even *Turner*'s more lenient standard.

For that matter, he did not consult with anyone—not even Mr. Pinkston's treating psychiatrist. ROA.3002; *see also* ROA.3311. And Dr. Kuiper did not provide Mr. Pinkston any notice of his decision, much less provide an adversarial hearing or other opportunity to contest the decision. ROA.3002.

Dr. Kuiper does not dispute these facts. Instead, he argues (at 34) that none of the procedural protections discussed in *Harper* was legally required because it was an "emergency." But absent a showing that all forms of process were impossible to provide, so-called emergency circumstances at most alter the nature of the procedures required. *See supra* pp. 23-24. Even where the decision to medicate is not made in advance, the analysis of the three *Mathews* factors will usually call for some form of pre-deprivation process. First, the "private interest … affected" (*Mathews*, 424 U.S. at 335) is still the "significant liberty interest in avoiding the unwanted administration of antipsychotic drugs" (*Harper*, 494 U.S. at 221). *See supra* p. 22. Second, the governmental interests (*Mathews*, 424 U.S. at 335) are still the "interests in prison safety and security" (*Harper*, 494 U.S. at 223). In assessing the governmental interests, the "administrative burdens" (*Mathews*, 424 U.S. at 335) may be greater in emergency-like situations, such that certain procedures cannot practically be provided and therefore should not be required. *See Kulas*, 159 F.3d at 456. But the third *Mathews* factor then weighs in the exact opposite direction: "[T]he risk of an erroneous deprivation" is far greater when

prison officials make spontaneous, unplanned decisions to medicate. *Mathews*, 424 U.S. at 335. That risk counsels strongly against a regime where no pre-deprivation process is provided. Thus, as the district court explained, unless the evidence shows that "the defendant could not comply with the notice and hearing requirements," some form of procedural protection is required before the injection is administered. ROA.3007.

Mississippi's forcible medication policy—which went unobserved in this case—at least attempts to reconcile these competing aspects of the *Mathews* analysis. Mississippi's policy generally requires that inmates be provided at least 24 hours' notice of the decision to forcibly medicate and then be allowed to participate in an "Involuntary Medication Hearing." ROA.454-455. Those procedures need not be followed, however, in "medically emergent situations." ROA.454. In those cases, a different—lesser but still important—procedural protection is mandated: a "licensed physician or psychiatrist" must make a finding that the inmate "presents an *imminent* likelihood of serious harm." ROA.454 (emphasis added).

Assuming *arguendo* that Mississippi's policy comports with *Harper* and *Mathews* (Mr. Pinkston takes no position on that question, and the Court need not resolve it), no contemporaneous evidence suggests that Dr. Kuiper found an "imminent likelihood of serious harm" before he ordered that Mr. Pinkston be

medicated.  Indeed, no such finding is reflected in either Dr. Kuiper's or Nurse Barron's notes from September 14.  *See* ROA.1333-1334.  Those notes indicate that Mr. Pinkston was "imitating animal sounds," "kicking on door," "requested from the officer to open the door so that he could knock … out" Nurse Barron, and continued "to make verbal threats that he would kill" Nurse Barron.  ROA.1333.  But the notes do not anywhere state that Mr. Pinkston posed an imminent danger of serious harm.  *See* ROA.1333-1334.

The only purported "evidence" of the requisite finding, then, is Dr. Kuiper's own retrospective assertions during this litigation that he apparently made the finding silently in his own mind.  *See, e.g.*, ROA.3581; ROA.3633-3634; Appellant Br. 56-58.  Yet it cannot be that prison personnel can avoid all procedural protections simply by stating years later that they thought there was an emergency.  Perhaps, in certain cases, the requisite finding could be inferred based on the circumstances (e.g., an inmate brandishing a weapon, or actively committing self-harm).  But there is no basis for such an inference here:  As explained above (at 30-32), Dr. Kuiper's latter-day claim is undermined by his own testimony concerning the events of September 14, which shows that Mr. Pinkston was not a danger, much less an imminent one.  Accordingly, there is no basis for finding that Dr. Kuiper actually complied with the Mississippi policy here.

In sum, then, this is precisely the case that *Harper* warned against, where there were "no procedural safeguards to ensure the prisoner's interests [were] taken into account." 494 U.S. at 233. Even if Dr. Kuiper were correct that *Harper* "did not 'establish[]' any '*particular* process that must precede the one-time administration of an antipsychotic drug,'" Appellant Br. 34 (emphasis added) (alteration in original), *Harper* and *Mathews* undoubtedly require *some* pre-deprivation procedure. Indeed, as the Supreme Court has explained, due process under the *Mathews* test almost always "requires some kind of a hearing *before* the State deprives a person of liberty." *Zinermon*, 494 U.S. at 127. Accordingly, because Dr. Kuiper "did not provide *any* process prior to" forcibly medicating Mr. Pinkston, he violated Mr. Pinkston's procedural due process rights. *Bowlby v. City of Aberdeen*, 681 F.3d 215, 221 (5th Cir. 2012).

## III. DR. KUIPER'S REMAINING CHALLENGES ARE UNAVAILING

Dr. Kuiper also questions two of the district court's ancillary rulings, but those rulings were correct and did not affect the outcome in any event. First, the district court was correct to exclude Dr. Kuiper's attempt to provide expert testimony about other mental disorders and their typical presentations, because Dr. Kuiper was not properly disclosed or certified as an expert witness. Second, although Dr. Kuiper does not appear to actually raise it as an independent basis for reversal, his various comments casting doubt on the district court's rejection of the

magistrate judge's report and recommendation are unfounded, and the Court should disregard them.

**A.    The District Court Did Not Abuse Its Discretion In Excluding Dr. Kuiper's Expert Testimony, And Any Error Was Harmless In Any Event**

The district court's ruling excluding Dr. Kuiper's purported testimony about mental illness generally was not only a proper exercise of discretion, but was required by Federal Rule of Evidence 701 and this Court's precedent. After Mr. Pinkston objected to testimony meant to "establish[] that [Dr. Kuiper] had both training and experience in treating mental health patients," ROA.3541, the district court ruled that Dr. Kuiper could not answer "general questions" about psychiatry that were not asked "specifically as to Mr. Pinkston." ROA.3542. Similarly, following another objection, the district court limited Dr. Kuiper's testimony about narcissistic personality disorder to a discussion of "how it manifested itself in Mr. Pinkston" rather than talking in "generalities" about different possible presentations of the condition. ROA.3552-ROA.3553. These topics are quintessential examples of expert testimony that may be provided only once a witness has been properly qualified as an expert, which Dr. Kuiper was not. The district court accordingly did not abuse its discretion.

Lay witnesses like Dr. Kuiper are limited to testimony that is "rationally based on [their] perception[s]" and is "not based on scientific, technical, or other

specialized knowledge." Fed. R. Evid. 701(a), (c). "To be admissible, 'a lay opinion must be … one that a normal person would form from those perceptions.'" *United States v. Masha*, 990 F.3d 436, 445 (5th Cir. 2021). "Lay opinion testimony is admissible if it requires '[n]o great leap of logic' and draws 'straightforward conclusions from observations informed by [the witness's] own experience.'" *Id.* (alterations in original). Accordingly, this Court has refused to allow testimony from a lay witness that purports to explain professional or technical practices, like medicine, "in the abstract." *United States v. Riddle*, 103 F.3d 423, 429 (5th Cir. 2019); *see also United States v. Cooks*, 589 F.3d 173, 180 (5th Cir. 2009) ("[A]ny part of a witness's opinion that rests on scientific, technical, or specialized knowledge must be determined by reference to Rule 702, not Rule 701.").

The Rules' line between personal perceptions (admissible lay testimony) and general recitations of specialized knowledge (inadmissible except through expert testimony) is exactly the one that the district court drew here. Dr. Kuiper was permitted to testify about his experience and perceptions treating Mr. Pinkston, but he was not permitted to testify about psychiatry generally, because he was not qualified as an expert in psychiatry. *See also* ROA.3517-3518 (indicating that Dr. Kuiper's background was not in psychiatry or mental health conditions). The district court's rulings were therefore correct, and certainly not an abuse of

discretion; they properly excluded testimony that rested on "a process of reasoning which can be mastered only by specialists in the field." *United States v. Yanez Sosa*, 513 F.3d 194, 200 (5th Cir. 2008).

Contrary to Dr. Kuiper's assertion (at 48-49), this conclusion does not change in light of "'his experience as a physician.'" He cites only two cases for that argument, neither of which casts doubt on the district court's decisions. *Williams v. Mast Biosurgery USA, Inc.*, 644 F.3d 1312, 1321 (11th Cir. 2011), affirmed a district court's ruling "limiting [the plaintiff's] treating physicians' testimony." In reaching that conclusion, the Eleventh Circuit explained: "when a treating physician's testimony is based on a hypothesis, not the experience of treating the patient, it crosses the line from lay to expert testimony." *Id.* at 1317-1318. That is exactly the rule the district court applied here. In *Davoll v. Webb*, 194 F.3d 1116, 1138-1139 (10th Cir. 1999), meanwhile, the doctor (who did not specialize in psychiatry or mental health) merely observed that the plaintiff "was suffering from psychological stress because" of interpersonal dynamics. The doctor "did not attempt to name a particular psychological disorder or give an in-depth analysis as to [the plaintiff's] mental health," and he certainly did not hypothesize about the plaintiff's condition based on purported background knowledge concerning particular disorders, as Dr. Kuiper attempted to here. *See id.* If Dr. Kuiper wanted to testify about how the purported "knowledge he gained"

from his experience treating other mental health patients "informed his understanding of how [Mr.] Pinkston's mental illness manifested itself" (Appellant Br. 49), he should have sought to be qualified as an expert witness.

In any event, any error in excluding Dr. Kuiper's expert testimony was harmless. The excluded testimony would have gone to the prong of the *Harper* inquiry that is not in dispute—"the inmate's medical interest," *Harper*, 494 U.S. at 227. As noted above (at 29), the district court's substantive due process holding rested solely on its conclusion that Mr. Pinkston was not "dangerous to himself or others." *Harper*, 494 U.S. at 227; ROA.3008 (finding that Mr. Pinkston "was not a danger to himself or others or property"). The excluded evidence is not relevant to that conclusion, because Dr. Kuiper's purported experience treating other patients with mental health conditions, and his purported background knowledge of mental illnesses, does nothing to demonstrate that Mr. Pinkston was dangerous on the morning of September 14, 2016. Dr. Kuiper does not meaningfully dispute this, as he argues primarily that the excluded testimony would have been relevant to whether "involuntary medication was in [Mr.] Pinkston's medical interest." Appellant Br. 49; *see also id.* at 62 ("Based on Dr. Kuiper's experience, Pinkston's behavior on September 14 manifested a mental illness, consistent not only with Pinkston's narcissistic personality disorder, but also with his previous mental health diagnoses."). Because Mr. Pinkston's medical interest (or even his precise

mental health diagnosis) was not the dispositive issue, the excluded testimony would not have affected the outcome.  Any error therefore did not affect Dr. Kuiper's substantial rights and was harmless.  *See Houston Aquarium, Inc. v. Occupational Safety & Health Rev. Comm'n*, 965 F.3d 433, 438-439 (5th Cir. 2020) (possible error in ruling on lay testimony was harmless because the testimony was not about a contested issue).

### B. The District Court Correctly Held That Mr. Pinkston Had Not Clearly Waived His Right To Be Present At The Evidentiary Hearing

Although Dr. Kuiper does not raise it as an independent basis for reversal, he implies at several points that the district court erred in rejecting the magistrate judge's report and recommendation stating that this case should be dismissed for failure to prosecute based on Mr. Pinkston's non-appearance at the hearing on May 23, 2019.  *See, e.g.*, Appellant Br. 10-16 (discussing report and recommendation at length); *id.* at 23 & n.6 (questioning the district court's credibility determinations regarding testimony on the waiver of Mr. Pinkston's rights); *id.* at 58-59 n.9 (arguing that the district court's refusal to consider evidence from the May 23 hearing was "inconsistent" with its admission of Nurse Barron's deposition testimony).  The Court should ignore these references because Dr. Kuiper has "abandon[ed]" the "argument on appeal" by declining to actually "analyze" the issue using "relevant legal authority."  *Binh Hoa Le v. Exeter Fin. Corp.*, 990 F.3d

410, 414 (5th Cir. 2021); *see also DeVoss v. Southwest Airlines Co.*, 903 F.3d 487, 489 n.1 (5th Cir. 2018) ("fail[ing] to provide any structured argument" on issue constitutes forfeiture). In any event, the district court's rejection of the report and recommendation does not provide a basis for reversal for two independent reasons.

First, the district court's factual findings were not clearly erroneous. Dr. Kuiper asserts (at 23) that the district court was unreasonable in crediting Mr. Pinkston's testimony over that of six other witnesses, but, as noted (at 17), credibility determinations can "virtually never be clear error." *Guzman*, 808 F.3d at 1036. Moreover, Dr. Kuiper's assertion neglects the fact that all of the defense witnesses were employees at the prison, *see* ROA.3133; ROA.3154; ROA.3167; ROA.3180; ROA.3193, giving them a shared incentive to testify favorably for their employer and a shared understanding of the events in question. Meanwhile, as a civil rights plaintiff, Mr. Pinkston had a fundamental right "to be present in the courtroom and to meaningfully participate in the process." *Lane v. Tennessee*, 315 F.3d 680, 682 (6th Cir. 2003), *aff'd sub nom. Tennessee v. Lane*, 541 U.S. 509 (2004); *see also Latiolais v. Whitley*, 93 F.3d 205, 210 (5th Cir. 1996) (holding that "excluding [civil rights plaintiffs] from the proceedings, without considering the need for them to be present, prejudiced the substantial rights of the plaintiffs"). Therefore, the district court was required to "indulge every reasonable presumption against waiver" of Mr. Pinkston's "fundamental constitutional right[]" to be

present.  *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938); *Roe v. Operation Rescue*, 920 F.2d 213, 217 (3d Cir. 1990) (right to be present can only be waived knowingly and intentionally).  A dispute that amounts to the prison's word against Mr. Pinkston's does not show proof of knowing and intentional waiver—especially given that Mr. Pinkston had, at the time, "actively pursued this litigation for approximately three years."  ROA.2883.

Second, the district court had the clear authority to reject the magistrate judge's report and recommendation for any reason.  *See* 28 U.S.C. § 636(b)(1) ("A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."); *United States v. Underwood*, 597 F.3d 661, 669 (5th Cir. 2010) (district court judges "retain the last word … [in] deciding whether to accept the resulting magistrate judge's report and recommendation").  Dr. Kuiper was not prejudiced by the court holding a second evidentiary hearing, as he had a fulsome opportunity to present evidence and testimony at the second hearing.  Indeed, Dr. Kuiper's decision to address this issue only in offhand comments that cite no case law is telling.  He has not developed any argument that the district court's holding on the waiver issue was flawed, or that its conducting a second evidentiary hearing with Mr. Pinkston present was prejudicial.  His assertions, unsupported by any cited authority, are nothing but distractions from the actual issues before the Court.

## CONCLUSION

The district court's judgment should be affirmed.

Respectfully submitted.

/s/ Mark C. Fleming

Mark C. Fleming
Sofie C. Brooks
Wilmer Cutler Pickering
    Hale and Dorr LLP
60 State Street
Boston, MA 02109
(617) 526-6000
mark.fleming@wilmerhale.com

Oren Nimni
Samuel Weiss
Rights Behind Bars
416 Florida Avenue NW, #26152
Washington, DC  20001
(202) 455-4399

Andres C. Salinas
Wilmer Cutler Pickering
    Hale and Dorr LLP
1875 Pennsylvania Avenue, NW
Washington, DC  20006
(202) 663-6000

*Counsel for Plaintiff-Appellee
Chaz Pinkston*

January 26, 2022

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B).

1.      Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(a)(7)(B), the brief contains 10,819 words.

2.      The brief has been prepared in proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman font.  As permitted by Fed. R. App. P. 32(a)(7)(C), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

/s/ Mark C. Fleming
MARK C. FLEMING

January 26, 2022

**CERTIFICATE OF SERVICE**

I hereby certify that on this 26th day of January, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

/s/ Mark C. Fleming
Mark C. Fleming